**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**

UNITED STATES OF AMERICA

vs.                                                                    Case No.1:08cr32-SPM

ALBERTO TRAVIESA,
and
JOSE REYES,

            Defendants.
_____/

## ORDER GRANTING DEFENDANTS' MOTION TO SUPPRESS

        This cause comes before the Court upon Defendant Reyes' motion to

suppress (doc. 217) and Defendant Traviesa's motion to suppress (doc. 218).

Because both motions are based on the same factual scenarios and address the

same legal issues, the Court held one consolidated hearing for both motions.

The Government filed a single reply to both motions (doc. 219).  Argument by

counsel at the evidentiary hearing clarified issues presented in the initial motion

and response.  Initially, Defendants believed that the Government justified their

stop of Defendants' truck by establishing probable cause that a moving violation

had occurred.  Therefore, Defendants' motions to suppress argued that

Defendants did not commit a moving violation and the Government did not have

probable cause to stop Defendants' truck on that basis.  However, through their

written reply and their argument in court the Government argued that a valid traffic stop is not necessary if the officer has reasonable suspicion that Defendants had engaged in or were about to engage in criminal activity. This argument revealed that the basis of the stop of Defendants' truck was the officers' collective reasonable suspicion.  Accordingly, the Court will evaluate this motion to suppress under the reasonable suspicion standard first articulated in Terry v. Ohio, 392 U.S. 1 (1968).

**FACTUAL BACKGROUND**

On May 15, 2008, Drug Enforcement Administration agent Wayne Andrews received anonymous information about a power diversion at 4351 SE 138th Terrace in Marion County, Florida.  At the suppression hearing, Agent Andrews testified that a power diversion is often associated with an indoor marijuana grow operation.  After conducting trash pulls at that location, the officers found information regarding another potential grow operation at 13202 SW 73rd Street in Ocala, Florida.  Further investigation resulted in the discovery of approximately four other locations where an indoor grow operation may have been underway.  By August 26, 2008, there were six houses under investigation for operating marijuana grow operations.  One of these locations was 6098 SW 204th Avenue, Dunnellon, Florida, in Marion County.  Another location was 6550 SE 123rd Terrace, Morriston, Florida, in Levy County.  This motion to suppress primarily involves the 6550 Levy County residence.

Police officers and DEA agents in both Levy and Marion Counties conducted surveillance on all the properties mentioned above. Agent Andrews testified that there were certain characteristics common to almost all of the houses involved in this marijuana grow operation investigation; underground powers sources, fences surrounding the property, animals in the yard, located in rural neighborhoods, significant land area, and owned by individuals with Hispanic last names. Lieutenant Dykstra also testified about certain commonalities to the houses that were under investigation. Lieutenant Dykstra stated that they were usually mini-farms, located in rural areas, on fenced-in properties, with gates, owned by people with Hispanic names. The 6550 residence was a mini-farm, that had livestock in the area around the house and the barn, the entire property was fenced in, and it was owned by a man with a Hispanic last name.

The surveillance of the properties resulted in the application of a search warrant for 6098 SW 24th Avenue, Dunnellon, Florida, in Marion County. The search warrant was obtained after an air conditioner mechanic reported to law enforcement that he saw approximately seventy marijuana plants growing inside the 6098 residence. Later, officers saw a U-Haul truck leave the 6098 residence and drive to a storage warehouse. The officers stopped the truck. The driver gave the officers permission to search the truck. Inside the truck, the officers found lights, ballasts, hydroponic equipment and a small quantity of marijuana.

Agent Andrews testified that these materials are often used in indoor marijuana grow operations.  The officers then obtained a search warrant for the 6098 residence.  Once they arrived, the officers saw evidence of a grow operation that had been dismantled prior to the execution of the search warrant.  The officers suspected that the grow house was dismantled after the occupants realized that the mechanic had seen the marijuana plants.  Levy County officers testified at the suppression that they were concerned that the same thing would occur at the 6550 residence.

One of the women who was at the 6098 residence during the execution of the search warrant told the officers that she had seen a grow operation at 4351 SE 138th Terrace, in Marion County, the residence where the officers had previously conducted the trash pull.  While conducting surveillance of the 4351 location, officers installed a generalized tracking device[1] on a car that had been seen at that residence.  This car was registered to Yosnel Montejo-Garcia.  The tracking device revealed that Montejo-Garcia's car traveled from the 4351 residence to the 6550 residence in Levy County.  Additionally, the electricity in the 6098 residence in Marion County was in the name of Yosnel Montejo-Garcia.  After learning that Montejo-Garcia's vehicle left the 4351 residence and drove to the 6550 residence, the Levy County officers initiated several weeks worth of

---

[1]  Agent Andrews testified that the tracking device is not able to provide a specific address at which the car stopped or how long the car remained at a particular location.  However, the device can determine and record streets visited and routes taken by a vehicle.

rolling and stationary surveillance of the 6550 residence.  No criminal conduct had been observed.  Agent Andrews testified that during his surveillance of the 6550 residence, he never saw Montejo-Garcia visit.  Nor had Agent Andrews ever seen Montejo-Garcia's vehicle at the residence.  The only evidence that Montejo-Garcia had been to the 6550 residence was a computer printout showing that on at least one occasion, Montejo-Garcia's car had gone to the 6550 residence.  Additionally, Agent Andrews could not positively testify that the Toyota truck that was stopped had ever been at the 6550 residence.  The officers continued their investigation and surveillance of the 6550 residence.

On or about August 26, 2008, Agent Andrews received a call from Marion County encouraging the Levy County officers to expedite their investigation of the 6550 residence  because the Marion County officers were preparing to "take down" or execute a search warrant on the 4351 residence in Marion County. Agent Andrews told Lieutenant Dwayne Dykstra in Levy County about the search warrant that was going to be executed in Marion County.  The Levy County officers became concerned that the occupants of the Marion County residences would notify the occupants of the Levy County residences and the grow operation in the 6550 residence would be dismantled before a search warrant could be obtained and executed.

On August 26, 2008, Lieutenant Dwayne Dykstra was conducting his usual stationary surveillance of the 6550 residence.  Lieutenant Dykstra was

dressed in plain clothes and was driving an unmarked vehicle.  At some point during the surveillance, Lieutenant Dykstra left his police vehicle and walked to the fence line of the 6550 property. Lieutenant Dykstra testified that he could see the house, a barn and two pickup trucks near the house.  As he observed the property from the fence line, he saw two trucks depart–a Ford truck and a Toyota truck. The Toyota truck was occupied by two males, Defendants Reyes and Traviesa.  The Ford truck was occupied by one male.  This motion to suppress involves only the Toyota truck.  Several Levy County officers testified at the suppression hearing about the factual basis that supported their determination that criminal activity was afoot.

Lieutenant Dykstra asked Corporal Rick Rogers, who was assisting with the stationary surveillance, but in a marked police vehicle, to follow the Ford truck.  Lieutenant Dykstra did not ask Rogers to stop the truck.  Lieutenant Dykstra testified that at the time he instructed Rogers to follow the truck, he did not know whether the search warrant in Marion County had been executed.  Neither was he aware of any criminal activity taking place at the 6550 residence, even when the tracked vehicle was present at the residence.  Lieutenant Dykstra testified that he had not previously seen the pickup truck at the 6550 residence.  However, Lieutenant Dykstra did know that the 6550 residence was owned by a man with a Hispanic name.

Corporal Rick Rogers testified that he was concerned that the people in

the 6550 residence would start dismantling their marijuana grow operation if the officers did not stop them.  This concern and Rogers' suspicion of the Defendants was escalated by the possibility that the Marion County officers had already executed the search warrant and the occupants of the Marion County residence were communicating with the occupants of the 6550 residence. Rogers testified that the driver of the Ford pickup truck was suspicious because he drove very slowly and when the truck passed Rogers' car, the driver made eye contact with Rogers.   Additionally, the trucks initially drove along the same route, but later split up to take different routes to reach the same road.  However, during his surveillance, Rogers did not see the occupants talking on cell phones. Rogers did not see the truck occupants load anything into the trucks.  Nor did Rogers see anything inside of the beds of the trucks as he drove by them. Rogers was aware that the owner of the house had a Hispanic last name. Because of their suspicious driving behavior and because of his concern about the take down of the grow operation in Marion County, Rogers decided to stop the Ford truck.  He then asked Captain Anderson to stop the Toyota truck.[2]

Captain Scott Anderson was driving in an unmarked car when he spotted the Toyota truck.  When Rogers asked Captain Anderson to stop the truck, Captain Anderson knew that the search warrant in Marion County was about to

---

[2]Captain Anderson testified that he was going to stop the truck anyway because the truck turned left at a stop sign without using a turn signal, even though there were no other vehicles in the vicinity of the Toyota truck that would have been affected by the driver's failure to signal.

be executed.  Captain Anderson testified that this information put pressure on him to expedite his investigation in Levy County.  Captain Anderson also knew that the 6550 residence had been connected to the 4351 residence through the tracking device on Montejo-Garcia's vehicle.  Anderson knew that the Marion County officers had discovered remnants of a marijuana grow operation at the 6098 residence, which is where they obtained information about the grow operation at 4351.  He also knew that the 6550 residence had been identified in a trash pull done at the 4351 residence.   However, Captain Anderson testified that he had done prior surveillance of the 6550 residence, but he had not seen any illegal activity there.

The testimony from the Levy County officers is unclear as to exactly when they knew that the search warrant had actually been executed in Marion County. They all testified that they knew of Marion County's intentions to execute the search warrant, but it is not clear when, in the midst of the Levy County officers' surveillance and stop of the Toyota truck, they found out that the search had actually been executed.  Captain Anderson testified that he had been told about the Marion County take down by Lieutenant Dykstra.  However, Lieutenant Dykstra testified that at the time he saw the trucks leaving the 6550 residence, he had no knowledge that the take down in Marion County had transpired.  Rogers testified that he cannot remember whether the search warrant for the Marion County house had already been executed at the time that he stopped the Ford

truck.  Although the record on this point is muddled, the Court will evaluate the totality of the circumstances and all of the officers' collective knowledge at the time that the trucks were stopped.  United States v. Acosta, 363 F.3d 1141, 1145 (11th Cir. 2004).  Regardless of the officers collective knowledge about the execution of the search warrant in Marion County, it is clear that there was no testimony that the search warrant had actually been executed, a call had been made to the occupants of the 6550 residence, or that the occupants of 6550 were scattering or working to dismantle any criminal activity that may have taken place in the residence.

The Government argues that the officer who stopped Defendants' truck was investigating an indoor marijuana grow operation at the residence from which the truck was leaving.  Because another house had been the subject of a search warrant and was connected to the 6550 residence, the officers believed that they had reasonable suspicion to stop the truck as it was departing the 6550 location.  The Government then argues that upon stopping the truck and smelling marijuana emanating from the truck, the officers had probable cause to detain the occupants and search the vehicle.  This Court finds that the officers did not have reasonable suspicion to initially stop the truck. Therefore, this Court will not address whether the officers then developed probable cause to detain, search and seize.

**ANALYSIS**

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. 4.  "A traffic stop, however, is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion" that a person is engaged, or is about to be engaged, in criminal activity.  United States v. Harris, 526 F.3d 1334, 1337 (11th Cir. 2008); Rankin v. Evans, 133 F.3d 1425, 1435 (11th Cir. 1998).  "A determination of reasonable suspicion is based on the totality of the circumstances, and it does not require officers to catch the suspect in a crime."  Harris, 526 F.3d at 1337 (citation and internal quotations omitted).  "Instead, reasonable suspicion of criminal activity may be formed by observing exclusively legal activity."  Id. (citation and internal quotations omitted).  Put another way, "[a] stop is supported by reasonable suspicion if, under the totality of the circumstances and from the collective knowledge of the officers involved in the stop, the police officers have an objectively reasonable suspicion that someone has engaged, or is about to engage, in a crime."  United States v. Allen, 274 Fed. Appx. 811, 818 (11th Cir. 2008) (citing United States v. Acosta, 363 F.3d 1141, 1144-45 (11th Cir. 2004)). "Additionally, the issue is not whether the particular officer involved actually and subjectively had the pertinent reasonable suspicion, but whether, given the circumstances, reasonable suspicion objectively existed to justify the investigatory stop."  Harris, 526 F.3d at 1337 (citation and internal quotations

omitted).  However, reasonable suspicion requires more than the officers'

collective "inchoate and unparticularized suspicion or 'hunch,'" but it must be

based on "specific reasonable inferences."  Terry v. Ohio, 392 U.S. 1, 27 (1968).

Although this is a standard that is lower than probable cause, the officers must

have "at least a minimal level of objective justification for making the stop."

Jackson v. Sauls, 206 F.3d 1156, 1165 (11th Cir. 2000) (quoting Illinois v.

Wardlow, 528 U.S. 119, 123,(2000)).   Accordingly, the central question in this

motion is whether law enforcement officers had reasonable suspicion or a

minimal level of objective justification for an investigative stop of the Toyota truck

that was carrying Defendants Reyes and Traviesa.

It is true that the officers suspected that illegal activity was taking place at

the 6550 location.  However, that fact does not result in reasonable suspicion

unless the officers could have reasonably linked the Defendants to that activity

given the officers' information at the time of the traffic stop.  If so, then stopping

the truck was reasonable and consequently, constitutional.  Terry, 392 U.S.  at

21 (stating that in an assessment of reasonableness, "it is imperative that the

facts be judged against an objective standard: would the facts available to the

officer at the moment of the seizure or the search 'warrant a man of reasonable

caution in the belief' that the action taken was appropriate?") (quoting Carroll v.

United States, 267 U.S. 132, 162 (1925)).

Because the officers suspected criminal activity was being conducted

inside of the 6550 residence, they decided to conduct surveillance on the location.  However, the mere fact that the occupants of the car emerged from a house which was suspected of being involved in narcotics activity is insufficient to provide reasonable suspicion that criminal activity involving these particular Defendants was afoot.  See Sibron v. New York, 392 U.S. 40, 62 (1968) (an inference that "persons who talk to [known] narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security");  Brown v. Tex., 443 U.S. 47, 52 (1979) (stating that the fact that a person is alone high crime area, engaged in behavior that "was no different from the activity of other pedestrians in that neighborhood" is an insufficient basis for an officer's determination that the person himself was engaged in criminal conduct).

There is a dearth of evidence to support reasonable suspicion that criminal activity involving these Defendants or this truck was underway.  There was no search warrant issued for the 6550 residence or property.  There was no evidence that contraband had been moved from the house to the truck.  In fact, officers testified that as they drove by the truck, there was nothing inside the truck bed.  This was not a high crime area.  The time that the Defendants were spotted leaving the house was not in the middle of the night or in the very early morning hours when people engaged in criminal activity may try to conceal their actions.  There is no evidence that the windows of the truck were tinted or that

the drivers tried in any way to avoid detection.  There is no evidence that the

Defendants saw the officers from the inside of the house and left in order to

evade capture.  No informant contacted police and told them that criminal activity

was taking place in the 6550 residence.  No informants had identified these

Defendants as people involved in criminat activity.   The connection between the

occupants of the 6550 and the occupants of the other marijuana grow operations

was tenuous, at best.  Officers' testimony indicated that but for the decision by

the Marion County officers to take down another house in the investigation, the

officers would not have stopped the Defendants in the truck.

The Government is asking the court to hold as a matter of law that a police

officer has the legal authority to make an investigative <u>Terry</u> stop of any car at

any time simply because the officer characterizes it as being in or coming from a

place that is suspected of criminal activity, with no additional basis for believing

that criminal activity by the occupants of that car is afoot.  Though the Court is

sensitive to the need of officers to have significant investigatory power in order to

execute their mandate to investigate and prosecute crimes, this type of blanket

intrusion into a person's personal security is exactly what the Fourth Amendment

was adopted to protect.

The Government has cited to <u>United States v. Nunez</u>, in which the

Eleventh Circuit reversed a finding by the District Court judge that the officers did

not have reasonable suspicion to conduct an investigatory stop of a vehicle that

was leaving a house where there was a suspected marijuana grow operation, but this case is factually distinguishable.  455 F.3d 1223 (11th Cir. 2006).  The officer in Nunez was instructed to "stop any cars leaving the Residence *if* the cars were loaded with items from the Residence."  Id. at 1225 (emphasis added).  Here, there was no such condition placed on the instruction from Rogers to Anderson to stop the Toyota truck.  Even Lieutenant Dykstra, who was in the best vantage point to see the trucks being loaded and then depart from the residence did not instruct Rogers to stop the truck.  He only instructed Rogers to follow it.   From the most favorable vantage point of all the officers, Lieutenant Dykstra did see anything that gave him reasonable suspicion to stop the trucks as they left the residence.

Additionally, the officers in Nunez smelled growing marijuana emanating from the residence.  Id. at 1224.  In this case, there was no testimony that the officers smelled marijuana emanating from the 6550 residence before the truck was stopped.  The officers in Nunez saw people loading boxes and garbage bags into the cars and trucks that were at the residence.  Id. at 1225.  Here, there is no evidence that the trucks were being filled or loaded with anything, let alone anything that could be considered contraband.  Lastly, in Nunez, the officer who gave the order to stop the departing vehicles had received notice that a search warrant had been executed for the location from which the vehicles were departing.  Id. at 1225.  Here, there was no search warrant application being

made, let alone approved.  In the Eleventh Circuit's reasoning, the court

specifically refers to the fact that the officer stopping the vehicles knew that

another officer "had probable cause to believe the Residence was a marijuana

grow house and that, therefore, a state judge had signed a search warrant for the

Residence."  Id. at 1226.   To summarize its reasoning, the Eleventh Circuit

further stated as follows:

> That these containers were removed from a residence for which a law
> enforcement officer had probable cause to believe was a marijuana
> grow house -- while the residence was under surveillance and shortly
> before it was to be searched -- supports a reasonable suspicion that
> [the Defendants] were involved and were removing marijuana or
> related contraband from the Residence.

Id.  None of these deciding factors are present in this current case.  Therefore,

the olfactory inspection of the truck which was obtained pursuant to the Terry

stop was therefore illegal and will be suppressed.  Any searches or evidence

resulting from the stop are consequently tainted.

Accordingly, it is hereby ORDERED AND ADJUDGED that Defendants

Reyes and Traviesa's motions to suppress (docs. 217 and 218) are hereby

**_granted_**.  The olfactory evidence obtained by the stop of the Defendants' truck

and any evidence proceeding therefrom shall be excluded from this case.

DONE AND ORDERED this sixth day of May, 2009.

_s/ Stephan P. Mickle_

Stephan P. Mickle
United States District Judge